Case number 13-1250 et al. Turlock Irrigation District et al. Petitioners v. Federal Energy Regulatory Commission. Mr. Whitaker for Petitioners Turlock Irrigation District et al., Ms. Race for Petitioner Tuolumne River Trust, and Ms. Lefting for the respondent. Good morning. The districts are challenging all three bases for FERC's assertion of mandatory jurisdiction over the district's 120-year-old LaGrange project navigability, occupation of federal lands, and post-1935 construction. I'll get to that in a moment, but first I want to give you a brief update on the LaGrange relicensing proceeding. Last Friday, the districts filed an updated study plan for their studies for the relicensing proceeding. And in that updated study plan, they proposed to study fish passage both at the LaGrange project and at Don Pedro. They will be studying both upstream and downstream fish passage as part of their study plan. Thank you, Mr. Whitaker. Turning to navigability, FERC asserted that the Tuolumne River is currently navigable and was navigable in the past. We think they're wrong on both counts. On the current navigability, they rely primarily on an affidavit from a person who rode a kayak up and back down past the site of the project. This kayak was a one-person kayak. It had no ability to transport any passengers, no ability to transport any cargo. So we don't believe that kayak trip demonstrates navigability because it doesn't show that there's a vessel capable of transporting goods and people in the highway of commerce. And they also relied on an affidavit from a California Department of Fish and Game official. We don't think that helps them either because that person and their boats and their drift boats for the agency, he only testified in his affidavit that he made it up to River Mile 51.5, which is downstream of all aspects of the LaGrange project. Well, pretty close, isn't it? Pretty close, yes. How far away? The tailrace channel looks like it ends at River Mile 51.6 or River Mile 51.7. About a tenth of a mile. About a tenth of a mile, correct. And isn't it not a factor that would defeat navigability if there's short portages or dry stretches that you might have to carry a small boat over? Yes, indeed, that's correct. Our theory on the portage item with the kayaker is since the kayak can't carry goods or services, the portage of this kayak is not something that really satisfies the portage test. We think you need a vessel that can transport goods and property in the highway of commerce. You have to show that that is capable of being portaged, and that wasn't shown. I mean, canoe is enough. I think the kinds of kayak that we've held weren't enough were those little tiny sporty kayaks that you can use on, like, a Class 4 Rapids or a Class 3 Rapids. This was more of a flatwater kayak, and they certainly can carry cargo if you choose to pack it in there. Well, all I know is that there's a place for the kayaker, and there's a little round spot in the back where they can put their clothing, I guess, for a two-day trip or three-day trip. Isn't that enough? I would think not. I would think that the Supreme Court, in its various decisions back to Appalachian Power Company and Rio Grande, they were thinking of cargo more, more substantial cargo than what they can put in a small thing. They could carry their clothing, but they could carry something else, right? They could carry their clothing, yes. They could choose to carry something else, something that would be an item in commerce. I suppose a small amount, yes. Going back to the past, I found it was sort of interesting and powerful that the state of California, long before these issues were even relevant, declared this river navigable right up to this point, didn't it? Yes, they did. I think it was 1851 they declared it navigable up to the canter or the foot of the falls. We don't know exactly where that would be. The foot of the falls in terms of the river could extend a ways down from where the actual dam is now. We have no evidence in the record pointing us exactly where that would be. To get the result you want today, you have to win on all three. Unfortunately, that's correct. What do you say about the occupying land? Well, on the occupying land issue, the districts went out and they actually went out and measured the gradient, the slope of the river. They found it was about one half foot and then about 5,400 feet upstream from the dam, it changed to 78 foot a mile. In their minds, the transition there from the slight slope to the more steep slope, that signified the end of the reservoir and the starting of the river. And your position is that's outside of the federal land? Right. The BLM land starts 5,850 feet upstream of the dam. Now, districts also did a... What was the commission's recitation as to what it was relying on in using the occupying land? The districts did a computer model to supplement their actual measuring of the gradients on the river. They did a computer model to try to verify where it would end. And they interpreted the results from the computer model as verifying what they found. FERC, however, took that analysis and tried to predict to a hundredth of a foot how far up it went. And their prediction was it actually went up to 11,000-something feet upriver. Given the standard of review, why wouldn't that be substantial evidence? Well, we admit that the court usually deferred to the agency on these types of technical matters. But as the districts point out, there's a lot of error in the data collection. There's generalized assumptions you have to make for the model. And therefore, trying to predict as precisely as FERC did is just not reliable because, frankly, the margin of error could surpass what is trying to be measured in the model. Let me go back to the navigability question. The salmon drift vessels, they were put in slightly below the power plant. But you have an affidavit of the effect that they plan in the future to put it in right at the power plant. And the only reason they went slightly below was because of those cliffs. What about that? Isn't that pretty powerful evidence? Well, they're kind of – when I talk about the power plant, it's kind of unclear what they talk about. For example, the affidavit said they put in right below – it came up right below the power house. But it was actually River Mile 51.5, which is downstream from the power house. So I'm not sure what kind of – But they said that because there was a cliff there. And they said they expected in the future to put it in right at the power plant. If they put it in right at the power plant, that's the end of your case, right? Yeah. Well, they're – by affidavit, they say they're going to do it. And for purpose of navigability, we look at the past. We look at the present. We look at the future plans. Mr. Whitaker, I just have a couple questions about the separate or joint licensing. You oppose the joint licensing of the Don Pedro and LaGrange sites. And I wonder if you can just give us why. And in particular, are you, in fact, opposed to fish ladders at both of these dams? Could you repeat the first part of your question? I'm sorry. Why would you be opposed, assuming, for the sake of argument, that both sites do need to be licensed? Why not a joint license for the whole complex? And then the second separate question is, do you, in fact, oppose having fish passages at each of the two dams? In terms of licensing LaGrange, LaGrange has been used for 120 years to divert water from the river, provide irrigation water to the districts, and they use that water to supply over 200,000 acres of arable land. And Modesto Irrigation District uses that water also to supply water to the city of Modesto. The district's concern about having LaGrange licensed is that FERC could put conditions in the LaGrange license which would severely impact the ability of the district to continue diverting the water they've been diverting for 120 years. So that's why we're concerned about licensing LaGrange. No, but that answers the question you asked. Do you have any position on whether, if it were subject to licensing, do you have a position on whether they would be appropriately licensed together? So already, I do understand that you're opposed to LaGrange having to meet licensing requirements at all. But if it were to have to, your position on joint versus separate? I think it makes no difference if they could be licensed together or separately. Now, in terms of answering your question of fish passage, it's kind of a question bang for your buck. Is there really a need for fish passage there? In our opinion, it hasn't yet been demonstrated that there's any fish bouncing their noses off the front of LaGrange Dam that want fish passage. But as I stated at the beginning, we are studying the concept of fish passage. And fish passage, no one wants fish passage at LaGrange just to get over LaGrange Dam to go up to Don Pedro and then do another fish passage over at Don Pedro. So the fish passage that the districts are looking at and that the agencies and even other conservation groups are advocating for is a collection facility of fish downstream of LaGrange in which they'll transport them upstream of Don Pedro. Transport them outside the river? Excuse me? Transport them outside the river? You can put them in trucks and then you move them up, you transport them upstream and put them back in the river there. And then you have to figure out some way, a mechanism to collect them from upstream and get them back downstream. I thought part of the question you were asking, do you have a position with respect to the standing of the intervener here? Oh, I'm sorry. Yes, I don't think they have standing. The reason why they, their position on standing is they're advocating, they're saying somehow they're injured by the commission not combining these together or not addressing fish passage. But as the scoping, September 5th scoping document that commission council filed shows, the commission appears to be in the same timeline on licensing Don Pedro and LaGrange. And right now the commission is planning to do a single EIS which will examine both at the same time. And now we've demonstrated at the request of the environmental groups and agencies that we're going to do, we're going to study fish passage. And so that'll all be considered in the joint EIS at first going to be on both projects. All right. Thank you, Mr. Roediger. Good morning, Mr. Rice. Good morning. Can you hear me? Excellent. Good morning. I'm counsel for Petitioner Twombly River Trust. And I would just like to start with addressing a few of the district's recent comments. You might want to start by addressing standing because if you're not here, it won't do you any good to address any of those others. Indeed, Your Honor. And some of the district's comments do indeed relate to standing in terms of the risk of harm that conservation groups and their members are facing. So conservation groups have standing here as organizations based on the imminent and concrete economic injury that they will suffer from having to participate in two proceedings. And haven't we generally, I know each case is its own context, but haven't we generally held that the legal fees of participating in litigation is not a harm for standing purposes, is recognizable for standing purposes? Yes, Your Honor. That is what this court has held. However, here we are not claiming any costs of participating in this litigation as injury to us. I thought you just told me that was the harm you were claiming, that it's going to cost you money to participate in the second litigation? No, Your Honor. I'm not talking about the costs of participating in this lawsuit. I'm talking about the cost of an additional agency proceeding. I'm talking about the other one, too. Is that not within our precedent that when you choose to participate in litigation or licensing or whatever, that's a self-inflicted harm, not a harm recognizable for standing? No, Your Honor. This court in International Brotherhood v. ICC specifically found that the concrete cost of participating in an additional agency proceeding was a cognizable Article III injury. And we agree with that holding. And likewise, this court equally found in Equal Rights Center that it is not a question of voluntary spending by an organization, that the motive for participation in a proceeding or otherwise is not what determines standing. Rather, it is whether expenses have been undertaken to counteract defendant's actions. You know what, counsel? I have to think about this, counsel. I don't remember that case. But as Judge Santel said, there must be scores of cases holding that litigation expenses is never injury. So what do we say in this labor case? So I can talk to you about both cases, Your Honor. Specifically, first, in International Brotherhood, this court actually said that the cost of litigating… What was the circumstance? What were the facts in that case? In International Brotherhood, Your Honor? Yes, the one you're citing that's contrary to all our other opinions, saying legal expenses are never injury. Well, Your Honor, I don't think this is contrary to the other cases, that this is about the participation in front of a proceeding. But in International Brotherhood, the union brought a case against the ICC, an agency there. And in making their ruling, the agency made a jurisdictional determination, and it determined that going forward, the agency would have the power to review all of the union's arbitration awards. That seems very distinguishable because there you're talking about the core function of the union in representing members. I mean, that's part of the work of the union day to day. That's in some way different from litigation to defend its interests or lobbying or appearing before board to defend its interests. It's actually membership representation. And what they were saying there was that if all of the arbitration awards that the union enters into from then on forward would have to be subject to more review, that would be an impediment to their fulfilling their mission. So I see how it's on a spectrum in terms of representation activities, but it does seem a little different in terms of the function of a union in representing its members in a kind of day-in, day-out way from what we're talking about here, which is just, you know, whether the trusts have to show up at two different licensing proceedings. Well, yes, Your Honor, that's why I also wanted to draw your attention to Equal Rights Center, in which this court said that the issue was not about voluntary spending it. They weren't going to look at the motive of an organization for spending in order to counteract a defendant's actions. And the only way here that in order to counteract FERC's actions is to participate in both proceedings. And FERC has reassured us in its brief that we will have the opportunity to fully present our views and shape the license terms, but we can only do that if we participate. It would be your ability to do something at the administrative level. Standing is not required. They're not on Article 3b. So the fact that they will permit your participation at the admin level has nothing to do with whether you have standing for this. Oh, yes, Your Honor, and I did not mean to imply that. I meant that according to Equal Rights Center, a petitioner has standing when they've undertaken expenses to counteract a defendant's action, and here the only way to respond to or counteract FERC's actions in dividing these proceedings is for conservation groups to participate in both, to have their voice heard in both, and to help shape the license terms in both of these. And I would like to respond to the district's point that we are not aggrieved because these separate proceedings will essentially end up on the same timeline. And I would like to point out that this is not entirely true. By 2016, the timelines will be close. They will not be identical. And, for instance, two Ready for Environmental Analysis notices will issue within months of each other. Do you have any case where we've held a party to be aggrieved because they're going to be participating in some other hearing? I mean, you got everything you wanted in this hearing, except that you didn't get the other plant included in the same proceeding. Do you have any parallel case where we've said that is an aggrievement, or for that matter, an article of free will? So this case, Your Honor, is distinguishable. I'm sorry, I do see that I'm hitting my rebuttal time. Is it— We'll let you know when we're done. Okay, thank you. So this case is distinguishable from this court's decision in Dom Tarmine in which the court held, just as you said, Your Honor, that there was no need for an additional ground of jurisdiction for a project because, specifically, there was nothing to be gained. I'm going to take that as a no to the question I asked you. If you don't have a case that's parallel to this one where we have held, the possible participation in another proceeding is enough to make you aggrieve or harm. Well, that would be the case of International Brotherhood, Your Honor, that we discussed previously where having to participate in an additional new proceeding was held to be a contractual— You didn't like Judge Prigard's analysis of that case. I beg your pardon, Your Honor? You did not like the presiding judge's analysis of that case. Well, sir, I simply disagreed somewhat with the conclusion that was drawn from the analysis. I would draw a different conclusion on the facts of this case. I wonder if you could speak a little bit to what is lost in— if both of the projects were to be subject to licensing, what is lost from them not being subject to one licensing procedure apart from any additional costs? It seems like on the merits of what your organization is focused on, it's that there should be some coordinated consideration of the environmental impact of the two dams. And it's not clear to me that there's any ground to conclude that the environmental planning will not be coordinated. In fact, they are preparing a joint environmental impact statement. Certainly, the lower dam would have to, in considering environment, think about the upper, and the upper would have to think about the lower. As Mr. Whitaker was saying, nobody would take fish from below LaGrange and put them into the waters between the two dams. If there's going to be fish passage, it's going to be coordinating the two. So it's just a little hard from the papers to understand exactly why so much opposition to the separate licensing, if indeed that were to be the result. Right. And, Your Honor, if your reasoning were correct, it makes perfect logical sense to consider the cumulative impacts of both in these two proceedings. But unfortunately, the facts that we have on the record now show otherwise, and I would draw the Court's attention to the Rule 28J letter that we submitted, which shows that separate proceedings, as opposed to a single proceeding, carry this inherent risk of harm in that they increase the risk that studies of fish passage in both proceedings will not be undertaken. And the critical point, the need for studies of fish passage early on in these proceedings, is that these studies form the record on which FERC must rely in order to create its joint license terms. So if you don't have these studies of fish passage at both projects, because as you say, it makes no sense to do it just at one, then you don't have a record on which FERC can rely in its joint EIS to actually address these cumulative effects. And we see in this case, in the record at JA-488, that FERC has rejected a study of fish passage in the Dom Pedro proceeding already. Well, wait a minute. What about the EIS? Wouldn't that consider it? Well, Your Honor, the joint EIS unfortunately comes too late in the process. At that point, necessary studies of fish passage have already been undertaken or not. The EIS looks back at all the studies that have been done, considers what they've shown us about the cumulative effects of these projects, and then makes license recommendations based on that. Your position is pretty speculative, isn't it? No, Your Honor. We see in this case already FERC has rejected studies of fish passage in the Dom Pedro proceeding. No, what I mean is speculative. And it has any negative consequences? For the fish, Your Honor. Fish aren't suing. No, indeed, the fly fishers are. Well, the negative consequences of having no studies on this issue means that FERC will have no record to base its license terms on. FERC can't just step in and say, well, we think fish passage should be done this way when there's no proof. I see your point. We'll ask FERC about that. Okay. And was it FERC and not the district that was doing the piecemeal studying? Maybe I'm confusing two different things on the record, but was it the district, I thought, that was doing the piecemeal study, not FERC? I thought you just now said that FERC was looking in the kind of tunnel vision way, only at the one project. I'm sorry, Your Honor, if it was confusing. In the separate Dom Pedro licensing proceeding several years ago, FERC rejected a study of fish passage. Now we have the LaGrange proceeding that is currently undergoing. And in our Rule 28J letter, we submitted that the district's proposed study plan also rejected a study of fish passage. Now, the district just stated this morning for the first time that they were going to actually look at fish passage. That was just filed with FERC on Friday. We have not had time to review what they proposed to look at. FERC has certainly not approved it. So at least on the record, at the moment, there is no planned study. And is the rejection of study of fish passage tied to the separate consideration of the two sites, or is it just they don't think there are, as Mr. Whitaker put it, fish bumping their noses against the downstream LaGrange Dam? The districts have said that they don't believe that there is evidence of suitable habitat beyond Dom Pedro. So the question of whether or not they're willing to consider fish ladders is not a result of joint or separate site consideration? No, Your Honor. I would say that it is definitely linked because it is possible when you have two separate proceedings, it is possible to, as we have seen, reject study of fish passage on the basis that, well, if you want to look at fish passage, you have to look at both projects. But the district said in their proposed study plan, well, we can't look at Dom Pedro because it's a separate project. I hate to beat a horse to death, but what is it that you claim Equal Rights Center does for your standing? I'm just refreshing myself, and I thought we held in that case precisely that litigation expenses were not harmed for purposes of investigation, were not harmed for purposes of standing. Yes, you did, Your Honor. Why isn't that case directly opposed to the position you want us to take in this case? Well, the outcome in that case was different than the outcome you're asking for here, Your Honor, but this court made several important observations, including that if a defendant's action prompts an organization to increase resources, it must devote to programs that are independent of the lawsuit it is bringing, then that is injury. And we are saying here the additional costs of the scientific reviews, analysis, and comments we will have to undertake in the licensing proceedings is independent. You're missing Judge Sintel's point. In both cases, we're talking about litigation. You're just talking about litigation at the administrative level. Well, Your Honor, again, I would point you back to International Brotherhood, where they seem to make a distinction, but I would also, Equal Rights Center, I think, is helpful in stressing in response to Judge Sintel's question that it's not about the motivation or the choice to spend. It's about counteracting action. Okay. An organization's expenditures and resources on their lawsuit does not constitute an injury in fact sufficient to establish standards. That's precisely, word for word, what we said in Equal Rights Center. That would seem to say you don't have standing, would it not? Well, Your Honor, with respect, I would disagree and point this court back to International Brotherhood as an excellent example of where agency proceeding participation is considered an injury. There you had an actual possible preclusion effect, didn't you, on future pursuit of the union's interest in their employee members' rights? Was there a possible preclusive effect involved in International Brotherhood? I would have to review, Your Honor, but I believe that the issue was if there was ever a challenge to the union arbitration awards or the union wanted to challenge any results, that then it would have to go through an extra proceeding. And here, if we want to challenge the studies that are being undertaken in either proceeding, we will have to participate in it in order to— You don't have to participate. I mean, that's the whole—part of the point. This is still in place. You don't have to participate. Well, as is quite stressed, it's not about the motive for participation. I'm not questioning your motivation. I'm sure you're among the best people in the world, but you don't have to participate. That's your choice, and that's just up to you, Your Honor. Let me ask you just one— It's not like they're regulating you. Just one question, Ms. Reyes. In terms of the studies, sort of even assuming that the effort and expense put into effective advocacy at the administrative level were a cognizable harm to you for purposes of standing, would you not typically want to look at the whole situation and you could use the same material to represent your interests in two separate administrative proceedings? Or am I missing something about how that works in practice? About how additional costs would be incurred in this case? Yeah, would be incurred. So it is specifically because these two proceedings cover many of the same overlapping issues that you get this issue of additional unnecessary costs. In essence, you have to do everything twice, even though you could fairly efficiently combine them together, and that imposes an extra layer of unnecessary bureaucracy risk. If you have two projects that are very dissimilar and are addressing different issues, it won't matter if you put them together separate. You have to address those issues anyway. But here, simply rewriting a report that is similar but also different, and this is the unnecessary burden. All right. Well, if there are no further questions, we'll hear from FERC why they would want to do such an inefficient thing. Thank you. Thank you, Ms. Reyes. Good morning, Ms. Luftig. Good morning, Your Honors. May it please the Court, Lisa Luftig for the Commission. I'll first address the process and your questions about the process. You know, from the document that I just filed recently on November 14th, the Commission plans to do a single environmental impact statement for both projects, and it looks like the timing is going to remain aligned, hopefully, and so we do believe that will be an efficient process for looking at the environmental issues. At the time when- What about her argument that that's post hoc? You will have lost the opportunity to look at the studies. That's incorrect, Your Honor. They will have an opportunity. At the time the studies were proposed for Don Pedro, the Commission did not find that LaGrange was jurisdictional. Now that the Commission has made its finding that the facility is jurisdictional, the studies will be revised. And, in fact, they have not even begun fish passage studies at Don Pedro for many reasons. I think there's a permit that they're waiting to get, so I don't- they will be doing fish passage studies. And will they do them jointly for the two dams as a coordinated unit? Yes, Your Honor. I believe that is the intention. The Commission has not made its final study plan determinations, and there's a process for doing that. So, you know, and I'd also like to point out, the only thing at issue in this case is the jurisdictional findings of the Commission. What the Commission does in the licensing process will be subject to review. So there would be an avenue for appeal on those separate proceedings. What is the interest of the Commission? It seems like, assuming these are both jurisdictional, it is a little hard to understand why the Commission would want to have them treated separately, just as Ms. Rice was saying from an efficiency perspective. The Commission routinely has parts of a-even if it were found part of a project, which it has not here, but even if it were part of a project, it could have separate licenses. And I think part of that goes to the fact that Don Pedro was in relicensing, and it had already filed its application and was down the road. To then require it to amend its application would, I would argue, might be even more inefficient than having them licensed separately. Then how would it work, given that Don Pedro is further along, to coordinate the timing and actually put the two on the same schedule, which it sounds like is the plan? It should not be difficult at all. The Commission has not formally amended Don Pedro's schedule yet, but I think part of the reason might be because it's still unclear what studies are going to be performed for LaGrange. So once that gets worked out, it's very easy for the Commission to amend the schedule. In all likelihood, and again this is speculation, but in all likelihood the projects would be licensed at the same time. And what was going on for the last 100-plus years? There was just no licensing at all at the LaGrange site. That's correct. The National Marine Fisheries Service brought to the Commission's attention that this facility very well may be jurisdictional. In fact, the Commission did find it jurisdictional. Is it safe to assume there was a state license to proceed through law, or is that incorrect? I am not sure, Your Honor. It may not have had any governance at all. Excuse me? It may not have had any governance by any government agency. No, I think facilities that are not licensed by the Commission are licensed at the state level. That's what I was asking. Yes, Your Honor. So it wasn't subject to no requirements at all. It would have been done at the state level. Yes. My sense is that your most straightforward ground for arguing for licensing jurisdiction is the Navajo Gold Waters ground. Does that match your sense, or would you want to push or promote one of the alternative grounds more powerfully? Certainly, the Commission could be affirmed on any one of the three alternate bases. Navigability also has a very strong record of evidence, and the FPL Energy Main Hydro case is a recent decision by this Court, and I believe this case falls neatly within those findings. The construction one? Excuse me?  No, it's navigability, Your Honor. No, what about the construction issue, the post-1935 construction? Yes, I think there is a very strong case that there was post-1935 construction. The only argument that I saw that the districts had was that the kilowatt hours were not reliable because the nameplate, excuse me, the plate wasn't necessarily shown to be correct. That's correct, and the Commission relied on the best available evidence that it had, Your Honor. Yes. If you can, you need only prevail on one of the three, any one of the three grounds. That's correct. And the opinion, as I read it, was written in those terms that at each point, each relevant point, the Commission declared that that ground was sufficient, so we don't have any kind of jittery problem. We can just confirm on one ground or another. Yes, Your Honor. And if I can just make two points on navigation. Judge Pillard, you had asked about the portages. I'd just like to point out that the Federal Power Act itself and its definition of navigable waters recognizes interruptions for land carriage. Right, that's why I was asking. Yes, so I think the Federal Power Act. But you don't even have to, you don't even need the land carriage. You're right up to the power plant anyway. That's correct. You're in the tailrace anyway. And, in fact, the declaration on JA 358-359 of Timothy Hayne that you had mentioned, Judge Silberman, where they plan to float rafts right at the powerhouse is pretty compelling evidence as well. If there are no further questions, have a seat. Thank you. Do we have any rebuttal? There is no rebuttal. All right, thank you. Case is submitted.
judges: Pillard, Silberman, Sentelle